erty. She is therefore entitled to such custody and possession as such trustee, and can no more be required to give security, as a matter of course, than the appellant executors could be required to give security as a condition precedent to the execution of the trust imposed in them. "Before making an order for such security," said the court in Re Camp, 126 N. Y. 377, 385, 27 N. E. 799, "there must be some fact alleged and proved tending to show the property would be unsafe and insecure in the hands of the tenant for life. 1 Story, Eq. Jur. § 604, and note; Hudson v. Wadsworth, 8 Conn. 348; Langworthy v. Chadwick, 13 Conn. 42; Clarke v. Terry, 34 Conn. 176." Undoubtedly this security may be required at any time when facts of improvidence, incompetency, insolvency, or other condition may disclose a menace to the rights of the remainder-men, but no such condition was disclosed in the court below. The testator's estate amounts to between $300,000 and $400,000, and the widow receives all the income, excepting what is devised to the daughter; and, as there is no claim that she is indebted in any way, there can be no pretense of insolvency. On the question of her intention to dispose of the principal of the personal estate, there was no proof against her on the oral examination of the executor. He testified that she had asked for certain money then on deposit, and stated that "she wanted to make some presents to some people, mentioning the names." This does not necessarily conflict with her sworn statement that she "may have stated that she intended to give away the income derived from such property." Her denial of any intent to dispose of any portion of the principal intrusted to her by the will is positive and explicit, and, under the circumstances, fully justifies the conclusion reached by the surrogate.

The decree should be affirmed, with costs to all parties out of the estate. All concur.

---

SHEPARD v. METROPOLITAN EL. RY. CO. et al.

(Supreme Court, Appellate Division, Second Department. March 6, 1900.)

1. EMINENT DOMAIN—ELEVATED ROAD—INJURIES TO PROPERTY—DAMAGES.

In an action for damages to the fee and rental value of premises by the erection of an elevated railroad, it appeared that the premises were purchased for $125,000, having a frontage of 104 feet on the street, and overlooked a churchyard, giving a clear view to the next street; that plaintiff subsequently changed the property into an office building, with stores; that in front of the premises the defendant railroad company's trains were made up; that the number of trains daily had greatly increased; that there is an unusual amount of steam, smoke, cinders, dropping water and oil; that effort had been made to find tenants, but without success. Held to support a finding of $60,000 damages to the fee and $43,694.33 to the rental value.

2. SAME—EXPERT TESTIMONY—VALUES.

On an issue as to the depreciation in value of certain premises by the maintenance of an elevated railroad in front, expert testimony as to the increase in values of property within an area seven blocks long by three wide, including the premises in question, is admissible, although covering localities of varying uses and values.

**3. SAME.**
   The testimony of another expert witness as to the course of values in other streets in the vicinity, not on the line of the road, is admissible, in connection with his other testimony, to the effect that values in the street in question had not risen in proportion to the rise in other streets.

**4. SAME.**
   In an action for damages to the rental value of a building by the maintenance of an elevated railroad on a street in front, evidence that the upper part of the building produced better rents because light, air, and view were unobstructed is admissible.

**5. SAME—USE OF PREMISES BY OWNER.**
   The owner of property abutting on an elevated railroad cannot be restricted to a particular use of his property, but may make such improvements as he thinks will be the most beneficial, although the railroad will be liable for increased damages thereby.

**6. SAME—MEASURE OF DAMAGES.**
   A finding of $5,000 a year damages to rental value of a building by the operation of an elevated railroad, based on the average loss of rents, is correct, although the evidence showed that some years the premises were unoccupied and other years rented.

Appeal from special term, New York county.

Action by Augustus D. Shepard against the Metropolitan Elevated Railway Company and the Manhattan Railway Company for damages. From a judgment for plaintiff, defendants appeal. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, HATCH, WOODWARD, and HIRSCHBERG, JJ.

Edward C. James (Charles A. Gardiner, on the brief), for appellants.
W. G. Peckham, for respondent.

GOODRICH, P. J. The defendants' road was built in 1878. The plaintiff, in March, 1889, purchased the premises in question for the sum of $125,000. They are situated on the westerly side of Trinity Place, between Rector and Thames streets, and about 200 feet south of the latter, having a frontage of about 104 feet. They measure 108 feet in the rear, and have a depth of 52 feet on the north side and 42 feet on the south, and are known as Nos. 70, 72, 74, and 76 Trinity Place. They are opposite the rear of Trinity Church Graveyard, where there is a sustaining wall about 15 feet high. On the lots in question is a six-story brick office building, about 40 feet deep on the north side and 32 feet on the south side. There are four stores on the ground floor. The building was changed to an office building in 1895, the lower floor being made into stores, and the upper floors into offices, with a hall in the middle, running north and south. The building has an elevator and steam heat. The original building was erected in 1867, and until 1872 was used as a storage warehouse. It was then purchased by the Western Union Telegraph Company for $85,000, and used for its business until 1879. In 1872, Trinity Place, which runs north and south, was widened about 50 feet by taking a strip on the westerly side, which resulted in cutting off more than half of the building, and making Trinity Place a street 80 feet in width. The telegraph company sold the premises to Tubbs, in 1888, for $106,000, by deed which contained a reservation to the grantor of all right of action against the defendants for damages by reason of the erection of the road. The plaintiff's deed contained a

reference to the reservation in the telegraph company's deed. The court, on trial without a jury, fixed the award of fee damages at $60,000, and of rental damages at $5,000 per annum from March 29, 1889, and the defendants appeal from the judgment entered thereon.

The defendants applied at the trial for an adjournment of the same to await the trial of an action brought by the Western Union Telegraph Company against this plaintiff and others to have reformation of the reservation clause of the deed from the telegraph company to Tubbs. It is not necessary here to state the full grounds of such motion, as we are of opinion that there seemed to be no sufficient basis for the motion, and the matter was decided within, and by a fair exercise of, the discretion of the court. It is enough to say that the other action related to the rights of the respective parties to the damages which are to be ascertained in the present action, and has no bearing upon the question of amount. The main contention of the defendants is that the award for fee and rental damages is excessive, and that the plaintiff sustained no damages arising from the maintenance of the road. This, on the record, is purely a question of fact, and there is evidence sufficient to sustain the finding of the court as to the injury to the premises and the amount of the damages awarded. It is necessary only to state the evidence briefly. Trinity Place, at the location in question, appears to be unique. We know of no similar situation. The block on which the plaintiff's lots are situated lies between Thames street on the north and Rector street on the south. These streets are narrow, and have a rapidly descending grade to the westward. The plaintiff's lots are in the middle of the block, and front on Trinity Church Graveyard, which has a blank wall about 15 feet high. The railroad structure was erected to a height 5 feet above the first story of the plaintiff's building, and extends clear across the street. From the upper floors of the building there is an outlook over the churchyard, which extends to Broadway, making the offices light and desirable, with opportunity for the display of signs visible on Broadway. It is shown that the place is not one where trains simply pass and repass, but where they are made up, changed, and shunted. There are several tracks, and the structure at this point is used more or less for making up trains or preparing them for their trips. Trains have greatly increased in frequency since the plaintiff's purchase. There is an unusual amount of steam, smoke, cinders, dropping water and oil. There is ample evidence to show serious injury occasioned to the premises thereby, and that the rental value of the building, either for store or office purposes, has been seriously impaired, and that there has been depreciation in the fee value of the property. The plaintiff contends that this results from the presence and peculiar use of the structure. The defendants contend that it results from the peculiar situation of the property, irrespective of the railroad. When the plaintiff bought the property, there were some tenants of the old building, which was changed, as has been stated, to an office building, in 1895. It was vacant, or partially so, most of the time. It was occupied by the Western Union Telegraph Company for a few months while the latter's own building on Broadway, where a fire had occurred, was being re-

paired. Diligent efforts were made to lease both the old and the new building, with little success. Experts in value were examined by the plaintiff and by the defendants. Their estimates of the depreciation varied greatly; the plaintiff's testifying to a decrease in fee and rental values to a much greater amount than was found by the court, while the defendants' experts placed it at a lower sum. There was abundant evidence to sustain the award. We find no reason, therefore, to interfere with the judgment in that respect.

The defendants' argument is that the plaintiff has the burden of proof to show an actual depreciation due to the maintenance of the road, or, if there has been no depreciation, that the increase in value, if any, has not been normal, and that the failure to reach the normal value is due to the defendants' acts, and that the increase in values "off" the line has not been due to benefits arising from the railway, and that, when the increase in the value of properties "off" the line is practically due to such benefits, the plaintiff must show that, after eliminating so much of such increase as is due to benefits, in order to establish a basis of comparison, there is still a discrepancy in the increase of the plaintiff's property attributable to the defendants' acts. For the purpose of meeting this method of argument, the plaintiff pursued a line of examination of expert witnesses of which a fair example may be found in the following. He asked his expert Plass: "Q. From Liberty street south, and for two or three blocks, and from Greenwich street on the west and Pearl street on the east, but off of the elevated railroad, what has been the course of values?" The defendants' counsel objected, on the ground that this was a very large portion of the city, and that the course of values differs in different localities. The objection was overruled, and the witness answered: "Upward. * * * From 50 to 250 per cent." "Q. As to rents and rental values off of the elevated railroad in the same district, has there been a course?" Same objection. "A. Upwards. * * * From twenty per cent. to one hundred per cent." To understand the nature of this objection, it should be said that Trinity Place is next to, and runs parallel with, Broadway. Liberty is the third street north of the property. Greenwich street runs parallel with and next west of Trinity Place, and has an elevated railroad structure. Between Trinity Place and Pearl street are Broadway, Nassau (and in some places Broad street), and William street. In other words, the question covered a large district, which any one familiar with lower Manhattan knows embraces many different kinds of property of very varying values. It afforded ample basis for presenting to the court general expert information as to the course of values of property in the neighborhood. It is not open to the error in the admission of evidence as to the value of specific pieces of property which was condemned in Jamieson v. Railway Co., 147 N. Y. 322, 41 N. E. 693, as raising many issues over separate pieces of property. In Lazarus v. Railway Co., 5 App. Div. 398, 39 N. Y. Supp. 294, the court had under consideration the damage to premises on Trinity Place, one block north of Shepard's property. It was said (page 402, 5 App. Div., and page 296, 39 N. Y. Supp.):

"Equally fallacious was the conclusion [of the referee] as to the extent of damage to the fee, the view taken in effect being that, as this property on the west side of Broadway did not increase in value proportionately to property on the east side of Broadway, this was due to the presence of the elevated railroad on Trinity Place. It was shown that the exchanges are, and always have been, to the east of Broadway; and it is conceded that the Stock Exchange is a center of business; and that even the interposition of Broadway, with its traffic, bears upon the values of the respective sides, as does the proximity of properties on the two sides with reference to Wall street."

In the case at bar the evidence in question was not confined to property east of Broadway, but included a much larger area, embracing property on both sides of Broadway. It is difficult, having in mind the Jamieson Case, to know what method of ascertaining damages could have been resorted to other than that adopted by the plaintiff. The court in that case said (page 325, 147 N. Y., and page 693, 41 N. E.):

"The elevated railroad cases in this court * * * indicate that the general course and current of values must be shown by persons competent to speak, leaving to a cross-examination any inquiry into specific instances, if such be deemed essential."

Golding, another expert, had been examined as to the course of values in the neighborhood, and was then asked: "Q. On different streets that you have mentioned (Pine, William, Nassau streets, Broad street, New, Wall, and Broadway), state what that course of values is (rental values) per square foot, and has been for the last two years,—from what to what?" The witness, under objection and exception, was permitted to answer. This must be considered with the other parts of his evidence. He testified that Trinity Place had been used before 1879 for storage purposes, and that Nassau street, above Cedar, had been used for restaurants and stationery stores; and he went on to detail the changes which had taken place in the other streets east of Broadway, while Trinity Place remained in the same or a worse condition than before. For the purpose of showing that, on account of the building and operation of the defendants' road, property on Trinity Place had depreciated, or had failed to reach the normal value of other property "off" the road, it was competent to show the general rise in values on other streets in the vicinity, and not on the line of the road; and this we understand to be in accord with the rule in the Jamieson Case. We think it was not error to admit the testimony.

Objection and exception were made to the admission of testimony as to what part of "buildings on Trinity Place, taking them as a whole," produced the better rents. The witness testified that the upper parts of such buildings produced better rents, because they were further up and away from the elevated road. The defendants contend that this evidence also was in conflict with the Jamieson Case. We do not agree with this view, especially when we take into consideration the fact that the upper stories of the plaintiff's building overlooked the open space of the churchyard, and gave a clear view to Broadway, which may be presumed to have made the premises more desirable for various causes, such as air, light, and opportunity for display of signs.

None of the defendants' other exceptions seem to us well found-ed, or to require especial discussion. It does not lie in the mouth of the defendants, who are trespassers upon this part of the street, to say that the plaintiff had no right to alter or change his building into what he considered to be the most beneficial use to which he could put his property, lest the defendants' damages should be in-creased thereby. An owner of property abutting an elevated rail-road structure cannot be restricted to some particular use of his property for the benefit of the railroad company. It was said in Storm v. Railroad Co., 82 Hun, 11, 13, 31 N. Y. Supp. 13:

"The character of the neighborhood, so far as it is affected by the existence and operation of the elevated railroad, affords no bar to an owner from im-proving his property with the best of structures, and the elevated road must compensate for damage to such structure by its continuing trespasses. If it desires to prevent the application of this rule, it must condemn the right upon which it has seized, and which it has appropriated. Until it does this, an owner cannot be prevented from improving his property as he sees fit, and, if such improvements do not make the return they would have done had there been no elevated road in the avenue or street, the elevated road must compen-sate for such loss."

The defendants' counsel criticises the finding of $5,000 per an-num from March, 1889, on the ground that in some years parts of the building were rented and in other years different parts, where-by the plaintiff's damages were not precisely equal in each year. We understand that the purpose of the court was to make an esti-mate based on the average loss of rents, and the result already stat-ed was reached. We think the judgment as to both fee and rental damages is sustained by evidence sufficient to require its affirm-ance.

Judgment affirmed, with costs. All concur.